UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ERNEST STEVE BARRY and
MICHAEL BURKHART,

                  Plaintiffs,

    - against -

THE CITY OF NEW YORK, et al.,

                  Defendants.
-----------------------------------------------------X

**MEMORANDUM
AND      ORDER**

11 CV 5533 (CLP)

On November 14, 2011, plaintiffs Ernest Steve Barry ("Barry" or "plaintiff") and Michael

Burkhart ("Burkhart") commenced this civil rights action, pursuant to 42 U.S.C. § 1983, against

the City of New York, the New York City Transit Authority ("TA" or "defendant"), and Officer

Steven Dutes, a member of the New York City Police Department, alleging false arrest, assault,

and battery, in violation of the plaintiffs' rights under the First, Fourth, and Fourteenth

Amendments of the United States Constitution, and Article I, sections 6, 8, and 12 of the New

York State Constitution.  In addition to compensatory damages, attorneys' fees and costs,

plaintiff Barry seeks a declaratory judgment that the TA's "ID Rule," 21 N.Y.C.R.R. §

1050.6(d)(3), is unconstitutional because it is vague and because it requires people using the New

York City transit system to carry identification documents.

By Notice of Motion dated July 23, 2012, plaintiff Barry moved for summary judgment

against defendant TA.  By Notice of Motion dated July 23, 2012, defendant TA cross moved,

pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(6), and 12(c), to dismiss the

Complaint for lack of standing and for failure to state a claim upon which relief could be

1

granted.[1]  For the reasons stated below, the Court grants plaintiff's motion for summary judgment and denies defendant's motion to dismiss.[2]

## FACTUAL BACKGROUND

Plaintiff Barry is a longtime train enthusiast and editor of the *Railfan & Railroad Magazine*. (Pl.'s 56.1 Stmnt[3] ¶ 5; Barry Decl.[4] ¶ 2; Def.'s 56.1 Resp.[5] ¶ 5).  On August 21, 2010, Barry and Burkhart were in New York to photograph the Nostalgia Train, a historic subway train operated by the Transit museum. (Pl.'s 56.1 Stmnt ¶ 6; Def.'s 56.1 Resp. ¶ 6; Barry Dep.[6] at 33-35).  Plaintiff and Mr. Burkhart spent the morning of August 21 photographing various subway trains, including the Nostalgia Train, and in the afternoon, they went to the Broad Channel

---

[1]On May 18, 2012, plaintiffs entered into a Stipulation of Settlement with the City of New York and Officer Dutes, resolving plaintiffs' claims against those defendants.  The settlement also resolved all of Mr. Burkhart's claims. (See Declaration of Carl J. Copertino, dated July 20, 2012 ("Copertino Decl. I") ¶ 11).  Thus, the instant motions relate only to defendant TA and to plaintiff Barry.

[2]On May 8, 2012, the parties consented to have the case assigned to the undersigned for all purposes, including entry of judgment.

[3]Citations to "Pl.'s 56.1 Stmnt" refer to Plaintiff's Local Civil Rule 56.1 Statement of Undisputed Facts, dated July 23, 2012.

[4]Citations to "Barry Decl." refer to the Declaration of Ernest Steve Barry, dated July 20, 2012 and attached as Ex. F to the Declaration of Mariko Hirose in Support of Plaintiff Ernest Steve Barry's Motion for Summary Judgment ("Hirose Decl."), dated July 23, 2012.

[5]Citations to "Def.'s 56.1 Resp." refer to Defendant's Statement in Response to Plaintiff's Undisputed Statement of Facts Pursuant to Local Civil Rule 56.1, dated September 10, 2012.

[6]Citations to "Barry Dep." refer to pages in the deposition of plaintiff Barry taken March 20, 2012 and attached to the Hirose Decl. as plaintiff's Ex. G and to the Declaration of Carl J. Copertino, dated September 10, 2012 ("Copertino Decl. II") as defendant's Ex. D.

subway stop where they took photographs while waiting for the Nostalgia Train to arrive. (Pl.'s 56.1 Stmnt ¶¶ 7-8; Def.'s 56.1 Resp. ¶¶ 7-8; Barry Dep. at 40, 42).

On August 21, 2010, Officers Steven Dutes, Nigel Balkaran, Joseph Brennan, and Lyndon Blakely were officers of the New York City Police Department ("NYPD"), responsible for enforcing the TA's rules and regulations. (Pl.'s 56.1 Stmnt ¶ 4; Def.'s 56.1 Resp. ¶ 4; Dutes Dep. at 14, 28; Balkaran Dep. at 18, 38; Brennan Dep. at 12, 37; Blakely Dep. at 22).[7] While Barry and Burkhart were waiting for the Nostalgia Train, Officers Dutes and Balkaran approached Barry and Burkhart, and, according to plaintiff Barry, the officers demanded that the plaintiffs produce identification. (Pl.'s 56.1 Stmnt ¶¶ 9, 10).

Defendant admits that the officers approached Barry and Burkhart because a train crew member informed the officers that there were two men on the tracks taking photographs. (Def.'s 56.1 Resp. ¶ 9). Defendant claims that as Officer Dutes approached the plaintiff and Mr. Burkhart, he saw them running up the steps from the tracks and putting their equipment away. (Id.; Dutes Dep. at 86). According to defendant, there was a sign at the location indicating that no one is allowed on the steps or on the tracks. (Def.'s 56.1 Resp. ¶ 9). Defendant contends that Officer Dutes told the plaintiffs that they were not allowed "down there" and that photography was not allowed in the subway system. (Id. ¶ 10; Barry Dep. at 46). Plaintiff Barry then asked the officer to cite the specific ordinance that prohibited photography and asked him to call his

---

[7]Citations to "Dutes Dep." refer to the Deposition of Steven Dutes, dated April 12, 2012; "Balkaran Dep." refers to the Deposition of Nigel Balkaran, dated April 10, 2012; "Brennan Dep." refers to the Deposition of Joseph Brennan, dated April 10, 2012; and "Blakely Dep." refers to the Deposition of Lyndon Blakely, dated April 10, 2012. These depositions are attached to the Hirose Decl. as plaintiff's Exs. B, C, D, and E and to the Copertino Decl. II as defendant's Exs. I, F, G, and H, respectively.

supervisor. (Def.'s 56.1 Resp. ¶ 9; Barry Dep. at 46-47). The officer then informed plaintiff that

no supervisor was necessary and he asked plaintiff for identification. (Def.'s 56.1 Resp. ¶ 9;

Barry Dep. at 47).

Plaintiff claims that in response to Officer Dutes' demand for identification, Burkhart

gave the officer his Pennsylvania driver's license, and Barry verbally identified himself by giving

the officer his full name. (Pl.'s 56.1 Stmnt ¶¶ 10-12). Defendant contends that the officer did

not "demand" identification and claims that although Barry verbally identified himself, he did so

only after the officer requested identification from Barry three times. (Def.'s 56.1 Resp. ¶¶ 10-

12). Defendant also claims that Barry "refused" to provide identification and tried to walk away

after being asked to stop. (Def.'s 56.1 Resp. ¶¶ 11-12). Defendant claims that Burkhart's

testimony supports defendant's claim that Barry did not initially comply with the officer's

request for identification. Citing Burkhart's testimony, defendant contends that it was only after

the officer put his hand on Barry to stop him from leaving that Barry gave the officer his name.

(Id. ¶ 12; Burkhart Dep.[8] at 42). The officer testified that Barry said at least twice, "I don't have

to give you ID." (Id.)

Barry claims that he did not give the officer an identification document, explaining that

he did not have one with him at the time. (Pl.'s 56.1 Stmnt ¶ 13; Barry Dep. at 90; Dutes Dep. at

37). According to Barry, he believed that he did not have his driver's license with him at the

time because "he frequently travels without a license when he is on the subway system for an

entire day of taking photographs." (Barry Dep. at 48). Plaintiff claims that after Barry gave the

---

[8]Citations to "Burkhart Dep." refer to the Deposition of Michael Burkhart, dated March
20, 2012 and attached to the Copertino Decl. II as defendant's Ex. E.

officer his full name but did not produce an identification document, the officer handcuffed Barry, searched for his wallet, found the wallet in Barry's back pocket, and retrieved Barry's driver's license which was in his wallet. (Pl.'s 56.1 Stmnt ¶¶ 15, 16; Dutes Dep. at 42).

Defendant contends that plaintiff Barry simply told Officer Dutes that he did not have ID and that he did not have to give Officer Dutes ID, rather than "explain[ing] that he did not have an identification document with him." (Def.'s 56.1 Resp. ¶ 13). Defendant further contends that the officer only handcuffed Mr. Barry after Barry "assumed a 'fighting stance' and 'started getting very loud,' stating 'I can take photos anywhere I want' and 'I don't have to give you ID.'" (Id. ¶ 15). Defendant asserts that Barry admitted that he was "irritated" because he had been told before that he could not take pictures.[9] (Id.; Barry Dep. at 52). The officer also denied that he searched Mr. Barry for his wallet. (Def.'s 56.1 Resp. ¶ 16). Instead, defendant claims that, after Officer Dutes had handcuffed Mr. Barry, Officer Dutes frisked Mr. Barry to find the wallet where plaintiff said it was located. (Id.) The officer claims that he asked for Barry's identification because he felt that "giving. . .his name was not good enough at the time, the way he was acting" (id. ¶ 17; Pl.'s 56.1 Stmnt ¶ 17), and the officer also wanted to run a warrants check and record his information on the TA summons. (Def.'s 56.1 Resp. ¶ 17).

Plaintiff claims that he was detained in handcuffs until the officer finished running the warrants check and preparing the notices of violation. (Pl.'s 56.1 Stmnt ¶ 18). According to defendant, less than 5 minutes after placing Barry in handcuffs, an officer escorted Barry to a waiting area upstairs, where Barry sat on a bench while Officer Dutes completed the paperwork,

---

[9]It is undisputed that the TA does not prohibit photography within the New York City Transit System. (Pl.'s 56.1 Stmnt ¶ 25; Def.'s 56.1 Resp. ¶ 25).

which took approximately 10 to 15 minutes. (Def.'s 56.1 Stmnt ¶ 18).

Barry and Burkhart were each given a Notice of Violation ("NOV") for "unauthorized photography" (id. ¶ 21; Pl.'s 56.1 Stmnt ¶ 21), and Mr. Barry was given a NOV for failure to produce identification under the ID Rule. (Pl.'s 56.1 Stmnt ¶ 19; Def.'s 56.1 Resp. ¶ 19). The ID Rule provides in relevant part as follows:

> All persons on or in any facility or conveyance of the authority shall:  provide accurate, complete and true information or documents requested by New York City police officers or authority personnel acting within the scope of their employment and otherwise in accordance with law.

21 N.Y.C.R.R. § 1050.6(d)(3).

Plaintiff claims that the officer gave him the NOV because the officer believed that Mr. Barry had not complied with the officer's request for identification. (Pl.'s 56.1 Stmnt ¶ 20). Although defendant appears to concede that the officer gave Barry the violation because he refused to comply with the request for identification, defendant cites Officer Dutes' testimony as further explanation. (Def.'s 56.1 Stmnt ¶ 20). Specifically, according to Officer Dutes: "[b]y walking away, putting his hands behind his back, the fighting stance, I have to ask him for ID, he was just like, I don't have ID, you know, so that's what I meant when I said he refused to comply." (Id.; Dutes Dep. at 51).[10]

Plaintiff alleges that Mr. Barry was directed to appear before the Transit Adjudication

---

[10]Defendants argue that Mr. Barry lied to Officer Dutes when he claimed not to have identification with him and that it is lying about not having an identification document in one's possession – rather than not having identification itself – that is a violation of the ID Rule. (Defendant Transit Authority's Memorandum of Law in Support of its Motion to Dismiss the Complaint, dated July 23, 2012 ("Def.'s Mem.") at 4). However, there is nothing in the record to indicate that Mr. Barry's alleged dishonesty, rather than his failure to produce identification, was the reason that Officer Dutes handcuffed Mr. Barry and issued him an NOV.

Bureau ("TAB") on October 1, 2010, requiring him to travel to New York City and miss a day of work. (Pl.'s 56.1 Stmnt ¶¶ 22, 23). The TA denies any responsibility for his lost wages, and notes that Mr. Barry could have contested the NOV in writing. (Def.'s 56.1 Resp. ¶ 23; Def.'s Ex. B[11]).

The TAB dismissed the NOV issued to Barry under the ID Rule based on the officer's failure to state a reason for the request for identification and it also dismissed the second Notice of Violation issued for the photography, noting that "[i]t is not illegal . . .to take photographs within the New York City Transit System." (Pl.'s 56.1 Stmnt ¶¶ 24, 25; Pl.'s Ex. J; Def.'s 56.1 Resp. ¶¶ 24, 25). Defendant cites the Declaration of Debra Siedman Dewan, a Senior Hearing Officer for the TAB, who represents that "'no person on or in any facility or conveyance of NYCTA is required to carry identification documents. Consequently, if a NOV merely charges a respondent with being unable to produce identification (that is, an identification document), the NOV must be dismissed for failing to state a prima facie case.'" (Def.'s 56.1 Resp. ¶ 24 (quoting Dewan Decl.[12] ¶ 5)).

Plaintiff lives in New Jersey, approximately two hours away from New York City, and he claims that he would like to travel to the City more often to photograph trains. (Pl.'s 56.1 Stmnt ¶¶ 26, 28). He contends that since the incident on August 21, 2010, he has been reluctant to travel to New York to photograph trains, and has only done so once at the end of January 2012. (Id. ¶¶ 27, 28). Plaintiff travels to the City every few months for other purposes, and although he

---

[11]Citations to "Def.'s Ex. B" refer to the Notice of Violation.

[12]Citations to "Dewan Decl." refer to the Declaration of Debra Siedman Dewan, dated July 20, 2012 and attached to the Copertino Decl. II as defendant's Ex. C.

7

now he carries his driver's license whenever he uses the Transit system (id. ¶¶ 29, 30), he claims that he wants to be able to leave his license in the car. (Id. ¶ 28).

The TA challenges the accuracy of Barry's claim that the incident has impeded his ability to photograph trains, noting that Barry testified that after being stopped in San Diego for taking photographs of the streetcar system, he was not deterred. (Def.'s 56.1 Resp. ¶ 27). According to defendant, when Barry was approached by Officer Dutes, he stated: "'okay, here we go again.'" (Id. (citing Barry Dep. at 53)). Defendant further denies that Barry suffered any actual injury from the incident and it denies that Barry is restricted in any way from either traveling to New York City or leaving his license in the car. (Id. ¶¶ 27, 28).

In the last ten years, 6,542 summons have been issued to people who fail to provide identification under the ID Rule. (Pl.'s 56.1 Stmnt ¶ 31; Pl.'s Ex. K[13]). Plaintiff asserts that the TA had no written policies, procedures or directives in effect as of August 21, 2010 that would describe when a NYPD officer may require a person to produce identification documents or ask a person to identify themselves orally. (Id. ¶¶ 32, 33).

The TA denies this claim and states that the TAB has Senior Hearing Officers who sit on the appeals of TAB Notices of Decision and who provide legal advice to hearing officers in their day-to-day conduct of hearings. (Def.'s 56.1 Resp. ¶ 32). According to defendant, these Senior Hearing Officers are familiar with the Rules of Conduct, 21 N.Y.C.R.R. § 1050, and with the TAB interpretation of these Rules. (Dewan Decl. ¶ 3). Defendant claims that every hearing officer is instructed that "no person on or in any facility or conveyance of NYCTA is required to

---

[13]Citations to "Pl.'s Ex. K" refer to the Transit Adjudication Bureau: 1050-6D3 Cases from 2002 to Present, By Year.

carry identification documents." (Id. ¶ 5; Def.'s 56.1 Resp. ¶ 32). The TA claims that in order

for a violation based on the failure to provide identification to be sustained, there must be facts

that establish that the police officer had a lawful basis to request identification and "the

respondent refused to comply, verbally gave false information, or provided false documents."[14]

(Dewan Decl. ¶ 8; Def.'s 56.1 Resp. ¶ 32). According to the TA, "'Hearing officers are

instructed that if a respondent credibly testifies that he or she verbally provided all the

information to the police officer on request but did not have any documentation to verify it, the

NOV must be dismissed for the reason that no person is required to carry identification.'"[15]

(Dewan Decl. ¶ 7; Def.'s 56.1 Resp. ¶ 32).

 Defendant also disputes plaintiff's claim that the officers are trained that the ID Rule

leaves it up to the discretion of the officer to decide what documents the officer can demand

(Pl.'s 56.1 Stmnt ¶ 36), and instead claims that officers are trained to ask for driver's license,

passport, immigration card, New York State identification cards, and to beware of certain

---

[14]The conduct for which Officer Dutes issued an NOV to Mr. Barry does not appear to fit into any of these categories. First, although defendant claims that Mr. Barry provided his name "only after Officer Dutes requested identification three times" (Def.'s 56.1 Resp. ¶ 12), it is undisputed that plaintiff eventually complied with the officer's request for identification. Second, as discussed supra n.10, the record does not show that the NOV was based on an allegation that Mr. Barry verbally gave false information. Finally, the TA has not alleged that Mr. Barry provided false documents. Thus, although defendant argues that the TAB's interpretation of the ID Rule guides the enforcement of the ID Rule, it is obvious from the testimony of the officers involved in this case, and from the NOV issued to Mr. Barry itself, that the officers did not understand this limiting interpretation. (See also discussion infra II.B.2). Further, considering the lack of written clarification or public guidelines, the TAB's interpretation of the ID Rule also fails to provide notice to the public as to what conduct is prohibited. (See id.)

[15]This after-the-fact limitation on the ID Rule does not appear to be memorialized in any written directive or other materials provided to the officers assigned to enforce the ID Rule.

common types of false identifications. (Def.'s 56.1 Resp. ¶ 36). Plaintiff, however, notes that the four officers who were deposed responded in different ways when asked to interpret the ID Rule, and that three of them did not understand the phrase in the ID Rule that reads: "otherwise in accordance with the law." (Pl.'s 56.1 Stmnt ¶¶ 38-53).

Plaintiff moves for summary judgment, claiming that, on the undisputed facts, the TA's ID Rule is unconstitutionally vague and burdens the freedom of movement without identification documents. (Pl.'s SJ Mem.[16] at 8). The TA cross-moves to dismiss the plaintiff's Complaint on the grounds that, because Barry lacks standing to seek a declaratory judgment under 28 U.S.C. § 2201, the Court lacks jurisdiction to entertain his claim and the Complaint is subject to dismissal under Fed. R. Civ. P. 12(b)(1) and (6). In the alternative, defendant argues that even if there was jurisdiction to consider the claims, the Court should exercise its discretion and decline to grant the requested declaratory relief.

## DISCUSSION

I. Defendant's Motion to Dismiss

Although the parties have filed cross motions, the Court first considers defendant's motion to dismiss because it raises a question of subject matter jurisdiction, without which the Court may not proceed to consider the merits of plaintiff's claim. Defendant argues that plaintiff lacks standing to seek a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. (Def.'s Mem. at 1-2).

---

[16]Citations to "Pl.'s SJ Mem." refer to Plaintiff Ernest Steve Barry's Memorandum of Law in Support of Motion for Summary Judgment, dated July 23, 2012.

A. Legal Standard

In a motion to dismiss for lack of subject matter jurisdiction, the party invoking federal jurisdiction has the burden of proving the Court's jurisdiction by a preponderance of the evidence. Luckett v. Bure, 290 F.3d 483, 497 (2d Cir. 2002) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). Moreover "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) (citing Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000)).

Both parties rely on documents outside of the pleadings in stating their positions on the motion to dismiss. Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. However, the Court is not required to convert the motion for judgment on the pleadings to a motion for summary judgment in this case, "because the moving defendants move against these claims on the basis of lack of subject matter jurisdiction and the Court can therefore look beyond the pleadings even without conversion." Goodwin v. Solil Mgmt. LLC, No. 10 CV 5546, 2012 WL 1883473, *4 (S.D.N.Y. May 22, 2012) (citing Building & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc., 448 F.3d 138, 150 (2d Cir. 2006)); see also Luckett v. Bure, 290 F.3d at 496-97.

11

B. Case or Controversy

Where no "case" or "controversy" exists between litigating parties, courts lack subject matter jurisdiction and may not adjudicate the case. Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012) (stating that "Article III limits the subject matter jurisdiction of federal courts to actual 'cases' or 'controversies'"). The Declaratory Judgment Act (the "Act") provides that, "[i]n a case of actual controversy within its jurisdiction. . .any court of the United States. . .may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). In the context of the Act, the phrase "case of actual controversy. . .refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128 (2007) (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)). In order for a court to exercise jurisdiction, the facts alleged in a case must "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. at 127 (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941) (holding that declaratory relief was available to an insurance company that alleged it was not liable to defend or indemnify an insured)).

Defendant argues that this Court lacks jurisdiction over plaintiff's claims because no "live dispute" currently exists. (Def.'s Mem. at 6). Defendant claims that the parties agree about how the ID Rule should be interpreted, and that, therefore, "there is no controversy." (Id. at 7). According to defendant, "the TA's longstanding interpretation of the ID Rule is that that rule does not require any customer to carry identification in the transit system. . . . Thus, on the precise interpretive question to which Mr. Barry would like an answer. . .there is no controversy

12

for this Court to decide and the case must be dismissed." (Id. (citing <u>GTE Sylvania, Inc. v.</u> <u>Consumers Union of the United States, Inc.</u>, 445 U.S. 375, 383 (1980))).  Defendant characterizes plaintiff's stake in this case as "merely an 'intellectual or academic curiosity' in the outcome." (Def.'s Mem. at 8-9).

In response, plaintiff claims that, "[a]lthough the [TA] insists that it has never interpreted the ID Rule to require transit users to carry identification documents, the issue is not its litigation interpretation of the ID Rule but the enforcement." (Pl.'s Mem.[17] at 10).  Plaintiff contends that, in practice, the ID Rule requires transit users to carry identification "because without such documents they can be handcuffed, detained, searched, and issued a notice of violation." (Id.) Barry contends that, since the parties presumably disagree about "whether such a *de facto* requirement is unconstitutional, an actual controversy exists." (Id. at 13).

The parties clearly disagree about the obligations created by the ID Rule and about whether the ID Rule is constitutional.  The TA contends that the ID Rule is constitutional and seeks to uphold the ID Rule whereas Mr. Barry seeks to have the Court invalidate the ID Rule. The parties certainly do not "desire precisely the same result." <u>GTE Sylvania, Inc. v. Consumers</u> <u>Union of the United States, Inc.</u>, 445 U.S. at 383 (citing <u>Moore v. Charlotte-Mecklenburg Bd. of</u> <u>Ed.</u>, 402 U.S. 47, 48 (1971) (finding no "case or controversy" where both parties to the suit had argued that the statute was constitutional and urged that a desegregation order be set aside)).

Finally, the present controversy is of sufficient immediacy and reality to justify the Court's exercise of jurisdiction.  A plaintiff need not expose himself to liability before bringing

---

[17]Citations to "Pl.'s Mem." refer to Plaintiff Ernest Steve Barry's Memorandum of Law in Opposition to Motion to Dismiss the Complaint, dated September 10, 2012.

suit to challenge the basis of threatened action by the government. In other words, "[t]he plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." MedImmune, Inc. v. Genentech, Inc., 549 U.S. at 128-29. "'[T]he declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity. . . .' The dilemma posed by that coercion – putting the challenger to the choice between abandoning his rights or risking prosecution – is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" Id. at 129 (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974) and Abbott Laboratories v. Gardner, 387 U.S. 136, 152 (1967)).

Accordingly, the Court finds that there exists an actual controversy between the parties sufficient to establish jurisdiction.


C. Standing

The plaintiff has the burden of establishing that he has standing to pursue his claims. See Marcavage v. City of New York, 689 F.3d at 103 (citing Raines v. Byrd, 521 U.S. 811 (1997)); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). In order to seek damages or "retrospective" relief, a plaintiff must show: 1) that he "suffered an injury in fact that is concrete and not conjectural or hypothetical;" 2) that "the injury is fairly traceable to the actions of the defendant;" and 3) that "the injury will be redressed by a favorable decision." Marcavage v. City of New York, 689 F.3d at 103 (citing Lujan v. Defenders, 504 U.S. at 560-61) (finding that plaintiffs had standing to seek damages where they claimed they had been arrested for protesting during the 2004 Republican National Convention ("RNC") in an area where demonstrating was

14

prohibited).  Where a plaintiff seeks equitable or "prospective" relief, he must show an additional element: "a sufficient likelihood that he will again be wronged in a similar way."  City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).  "That is, a plaintiff must demonstrate a 'certainly impending' future injury."  Marcavage v. City of New York, 689 F.3d at 103 (citing Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (finding that where plaintiffs were arrested for protesting at the RNC, plaintiffs did not have standing to seek equitable relief because no future national convention was scheduled to be held in New York and plaintiffs had not shown that similar policies would be enacted even if one were to be held).

Defendant claims that plaintiff has failed to demonstrate that his injury is "fairly traceable to the actions of the [TA]."[18]  (Def.'s Mem. at 10).  According to defendant, "the TA did not question Mr. Barry at the Broad Channel subway station; the TA did not detain him, frisk him, handcuff him, or issue him any NOV.  Former defendant Dutes (employed by former defendant City of New York) did those things."  (Id.)  The TA argues that all the TA is alleged to have done is: "(i) to have the ID Rule as one of its rules of conduct (a rule whose mere existence per se is not alleged to have caused any damage to Mr. Barry for which compensatory damages would be appropriate), and (ii) to dismiss (essentially immediately) a Notice of Violation of the ID Rule that the Police had given to Mr. Barry."  (Id.)

Defendant also claims that plaintiff has failed to demonstrate a certainly impending future

---

[18]The section of defendant's memorandum of law in which this argument appears is titled "No Compensatory Damages are Awardable to Mr. Barry" and is specifically focused on whether or not compensatory damages should be available in this case.  (Def.'s Mem. at 10).  However, since one element of standing requires Mr. Barry to establish a causal connection between the conduct of the TA and Mr. Barry's injuries, the Court considers defendant's argument as part of its challenge to Mr. Barry's standing to bring this lawsuit.

injury. (Id. at 8).  According to the TA, "[b]y the time this action was commenced,. . .Mr.

Barry's. . . dispute with. . .the. . .ID Rule. . .had long ended, and there. . .is no likely chance of

repetition." (Id. at 2).  The TA contends that Barry's "dispute. . .may be said to have begun on

August 21, 2010, when NYPD Officer Dutes. . .gave Mr. Barry. . .[an] NOV assert[ing] a

violation of the ID Rule" (id.), but it ended once the NOV was dismissed by the TAB for failing

to "state a reason for [the police officer's] request [for identification]." (Id. at 4-5).  Defendant

claims that Mr. Barry "has not shown or even alleged any likelihood that his rights will be

violated by the TA in the future. . .through the existence of the TA's ID Rule." (Id.)  According

to defendant's characterization of Mr. Barry's pleadings, the Complaint does not allege that Mr.

Barry has had "*any* problem involving the enforcement of *any* TA rule of conduct since 2010,"

but instead "merely alleges that Mr. Barry has 'not returned to New York to take

photographs;'. . .'[is] apprehensive about encountering the police when taking pictures of trains

in *other* urban areas;' and now 'carries his driver's license with him everywhere.'" (Id. at 5

(emphasis in the original)).

Plaintiff contends that his injury is fairly traceable to the TA "as the entity that wrote and

promulgated the unconstitutional policy that caused damage to Mr. Barry. . . .  [E]ntities can be

held liable for harm caused by the enforcement of [their] unconstitutional policies." (Pl.'s Mem.

at 1).  Plaintiff further claims that he has alleged a certainly impending future injury sufficient to

establish jurisdiction. (Id. at 13-15).  Although Mr. Barry's August 21, 2010 encounter with

Officer Dutes "is long over[,]. . .Mr. Barry's declaratory judgment claim arises not from his past

encounter with Officer Dutes but from the fact that Mr. Barry is subject to the *de facto*

requirement to carry identification documents every time he uses the [TA] system," or run the

16

risk of arrest. (Pl.'s Mem. at 14). Plaintiff claims that he lives only two hours away from New York City and that he has "credible plans to use the New York City [TA] system again in the future on a consistent basis and [a] credible desire to take photography trips to the [TA] system without carrying identification documents." (Id.; Barry Decl. ¶ 3). Specifically, Mr. Barry contends that he travels into New York City "every few months and use[s] the [TA] subway" and that he intends to continue to do so. (Barry Decl. ¶ 11). Mr. Barry further states that he now carries his driver's license when he will be using the TA system, but that he "would like to travel to New York City more often on trips to photograph the trains, and . . .leave [his] driver's license behind in the car. . . ." (Id. ¶¶ 10-11).

The Court finds that plaintiff Barry has satisfied his burden to establish standing to pursue both monetary damages and equitable relief because he has shown by a preponderance of the evidence that: 1) he suffered an injury in fact that is concrete and not conjectural or hypothetical; 2) the injury is fairly traceable to the actions of the defendant; 3) the injury will be redressed by a favorable decision; and 4) there is a sufficient likelihood that he will again be wronged in a similar way.

First, there is no genuine dispute that the ID Rule has been enforced against Mr. Barry in the past. (Compl. ¶¶ 18-20). Although the NOV was dismissed, Mr. Barry was issued a NOV under the ID Rule and he had to contest the NOV to avoid being subject to civil penalties.

Second, the alleged injury is fairly traceable to the TA as the body "responsible for writing and promulgating" the ID Rule. (Compl. ¶ 47). It is well established that a claim that "[a] municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because

17

an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)). Although the TA is not a municipality and the NYPD officers are not employees of the TA, NYPD officers are expressly authorized to enforce the ID Rule. N.Y. Comp. Codes R. & Regs. Tit. 21, § 1050.12 (empowering "[a]ny New York City police officer. . .to issue a notice of violation of any of [the TA rules of Conduct]). The TA may not distance itself from its own rule by implying that the NYPD officers explicitly tasked with enforcing the ID Rule are "an unknown third-party." (Def.'s Mem. at 11).

Third, a decision in Mr. Barry's favor would clearly redress his injury and prevent future injury. Where the plaintiff is "himself an object of the action. . .at issue[,]. . .there is ordinarily little question. . .that a judgment preventing or requiring the action will redress it." Lujan v. Defenders of Wildlife, 504 U.S. at 561-62. Here, if the Court were to find that the ID Rule is unconstitutional, Mr. Barry would no longer face the threat of future enforcement of the ID Rule or be subject to the obligations it creates.

Finally, by introducing plausible and uncontroverted evidence that he intends to continue to use the TA system, thereby potentially subjecting himself to the allegedly unconstitutional ID Rule (Barry Decl. ¶¶ 10-11), plaintiff has demonstrated a sufficient likelihood of future injury to seek a declaratory judgment. Although "'some day' intentions – without any description of concrete plans – do not support a finding of 'actual or imminent' injury, Lujan v. Defenders of Wildlife, 504 U.S. at 563, plaintiff's sworn affidavit avers that he has continued to travel to New York City since the incident in 2010, and he uses the TA system every few months. Defendant

18

does not contest that Mr. Barry has continued to use the TA system, but only that he is unlikely to be prosecuted under the ID Rule in the future. There is no requirement, however, that plaintiff violate the law again for the Court to exercise jurisdiction over his claims. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. at 129. "In short, [p]laintiff has established that [he] wishes to exercise [his] purported [constitutional right]. . ., that [his] attempts to do so have been frustrated in the past, and that [his] attempts will continue to be frustrated in the future absent judicial relief." New York Civil Liberties Union v. New York City Transit Auth., 675 F. Supp. 2d 411, 427 (S.D.N.Y. 2009), aff'd, 684 F.3d 286 (2d Cir. 2012).

### D. Discretion under the Declaratory Judgment Act

Defendant takes the position that, even if the Court finds that Mr. Barry has standing in this case, "the Court may nevertheless exercise its 'substantial discretion' under the Declaratory Judgment Act to, and should, dismiss the prayer for declaratory judgment, essentially for prudential reasons." (Def.'s Mem. at 9 (citing Wilton v. Seven Falls Co., 515 U.S. 277, 282, 286 (1995); Nordlinger v. Hahn, 505 U.S. 1, 12-13 (1992); Dow Jones Co. v. Harrods, 237 F. Supp. 2d 394, 431 (S.D.N.Y. 2002), aff'd, 346 F.3d 357 (2d Cir. 2003))). Defendant claims that, in the "highly unlikely" situation that plaintiff's dispute were to reoccur, "it would presumably do so under a new set of facts and in a new context." (Id.) Defendant further contends that "even if [Barry's claim were] somehow theoretically justiciable today[, it] is as a practical matter unripe, and for prudential reasons. . .this Court should not entertain it." (Id. at 9-10).

In response, plaintiff argues that the TA "misunderstands the basis of [Barry's] declaratory judgment claim, which is based on the ID Rule's current impact on Mr. Barry

19

whenever he uses the [TA] system." (Pl.'s Mem. at 15). According to plaintiff, the "current and ongoing impact" of the ID Rule makes the dispute ripe for adjudication. (Id.)

"The Declaratory Judgment Act provides that a court '*may* declare the rights and other legal relations of any interested party,' 28 U.S.C. § 2201(a), not that it *must* do so. This text has long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" MedImmune, Inc. v. Genentech, Inc., 549 U.S. at 136 (emphasis in the original) (citing Wilton v. Seven Falls Co., 515 U.S. at 286). The Court finds that awaiting further prosecution of Mr. Barry under the ID Rule would not assist the Court in adjudicating Mr. Barry's claims of a constitutional violation. Thus, the Court declines to exercise its discretion to dismiss Barry's prayer for declaratory judgment.

Accordingly, the Court finds that plaintiff Barry has standing to pursue both prospective and retrospective relief, and the Court proceeds to address the merits of the plaintiff's summary judgment motion.

II. Motion for Summary Judgment

A. Legal Standard

It is well-settled that a party moving for summary judgment has the burden of establishing that no genuine issue of material fact is in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976);

20

Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that "[s]ummary judgment is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen considering a motion for summary judgment the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party"), abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199 (2d Cir. 2006).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted).

B. Void-for-Vagueness Challenge

Plaintiff argues that summary judgment is appropriate because, on its face, the TA's ID

Rule is unconstitutionally vague. (Pl.'s SJ Mem. at 9-15). The ID Rule provides, in relevant

part, that:

> All persons on or in any facility or conveyance of the authority
> shall:  provide accurate, complete and true information or
> documents requested by New York City police officers or
> authority personnel acting within the scope of their employment
> and otherwise in accordance with law.

21 N.Y.C.R.R. § 1050.6(d)(3).

1. Legal Standard

"'As generally stated, the void-for-vagueness doctrine requires that a penal statute define

the criminal offense with sufficient definiteness that ordinary people can understand what

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement.'" United States v. Morrison, 686 F.3d 94, 103 (2d Cir. 2012) (quoting Kolender v.

Lawson, 461 U.S. 352, 357 (1983)), cert. denied, 133 S. Ct. 955 (2013).  A court may invalidate

a criminal law if it fails to fulfill either of these requirements, City of Chicago v. Morales, 527

U.S. 41, 56 (1999), but the more important aspect of the vagueness doctrine is "the requirement

that a legislature establish minimal guidelines to govern law enforcement." Kolender v. Lawson,

461 U.S. at 358 (quoting Smith v. Goguen, 415 U.S. 566, 574 (1974)).

In Kolender v. Lawson, 461 U.S. 352, the Supreme Court struck down a California statute

that required persons who loiter or wander on the streets to provide "credible and reliable"

identification and to account for their presence when stopped by an officer pursuant to the

reasonable suspicion standards of Terry v. Ohio, 392 U.S. 1 (1968).  Under the statute, an

22

individual who failed to provide "credible and reliable" identification could be arrested.

Kolender v. Lawson, 461 U.S. at 356. In examining the California statute at issue in Kolender,

the Supreme Court concluded that the statute as drafted and as construed by the state courts[19]

"contains no standard for determining what a suspect has to do in order to satisfy the requirement

to provide a 'credible and reliable' identification." Id. Instead, the Court found that the statute

"vests virtually complete discretion in the hands of the police" and therefore had the "'potential

for arbitrarily suppressing First Amendment liberties. . . .'" Id. (citing Shuttlesworth v. City of

Birmingham, 382 U.S. 87, 91 (1965)).

In City of Chicago v. Morales, the Supreme Court invalidated a loitering ordinance,

which required a police officer, on observing a person whom he reasonably believed to be a

criminal street gang member loitering in any public place with one or more other persons, to

order all such persons to disperse; the ordinance made failure to obey such an order a criminal

offense. 527 U.S. at 65. In finding the ordinance unconstitutionally vague, the Court held that

the ordinance "afford[ed] too much discretion to the police and too little notice to citizens who

wish to use the public streets." Id. at 64. Specifically, the Court found that "the vagueness that

dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,'

but rather about what loitering is covered by the ordinance and what is not." Id. at 57. The lack

---

[19]Noting that a federal court evaluating a facial challenge to a state law should "consider any limiting construction that a state court or enforcement agency has proffered," id. at 355 (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494 (1982)), the Kolender Court cited the fact that the California Court of Appeals had construed the statute at issue as requiring "identification 'carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself.'" Id. at 356 (quoting People v. Solomon, 33 Cal. App. 3d 429, 108 Cal. Rptr. 867 (1973))). Even with that limiting construction, the Supreme Court found the statute unconstitutionally vague.

of guidelines to govern enforcement served as an independent basis for the Court in <u>Morales</u> to invalidate the ordinance; with respect to this rationale, the Supreme Court held that the ordinance "necessarily entrust[ed] lawmaking to the moment-to-moment judgment of the policeman on his beat," because police officers had "absolute discretion to decide what activities constitute loitering." <u>Id.</u> at 60-61.

By contrast, the Supreme Court recently upheld Nevada's "stop and identify" statute as constitutional. The statute, which provided that any person detained by a peace officer was required to identify himself, had been interpreted by the Nevada Supreme Court to require only that a suspect disclose his name, and not a driver's license or any other document. <u>Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County</u>, 542 U.S. 177, 185 (2004). Thus, even though the petitioner in <u>Hiibel</u> did not allege that the statute at issue was unconstitutionally vague, the Supreme Court explicitly noted that the Nevada statute was "narrower and more precise" than the law at issue in <u>Kolender</u>. <u>Id.</u> at 184.

Plaintiff contends that the TA's ID Rule is not meaningfully distinguishable from the law invalidated in <u>Kolender</u>. (Pl.'s SJ Mem. at 9). According to plaintiff, like the law at issue in <u>Kolender</u>, the TA's Rule here: 1) has criminal applications; 2) fails to provide explicit standards of enforcement, encouraging arbitrary enforcement; and 3) reaches a substantial amount of constitutionally protected conduct. (<u>Id.</u> at 10).

With respect to the ID Rule's criminal applications, plaintiff argues that a violation of the ID Rule may subject a person to criminal prosecution resulting in a fine or imprisonment or both. (<u>Id.</u> at 14). According to plaintiff, the fact that a violation of the ID Rule can also lead to civil penalties is immaterial, because "a law with civil and criminal applications must 'possess a

24

degree of certainty required for criminal laws.'" (Id. at 14-15 (citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 255 (1989) (Scalia, J., concurring))).

Plaintiff also argues that the ID Rule fails to provide explicit standards of enforcement, encouraging arbitrary enforcement. Plaintiff contends that the ID Rule does not define what "accurate, complete and true information or documents" an NYPD officer may demand from a Transit user and what response adequately complies with a demand for identification. (Id. at 8). Nor are there any limiting guidelines of the ID Rule to help guide enforcement. (Id. at n.6). Instead, according to plaintiff, NYPD officers are told during training that the ID Rule "leaves 'up to the officer's discretion' the identification information and documents that they can demand.'" (Id. at 11). Plaintiff contends that NYPD officers may, under the language of the ID Rule, demand a wide range of information and documents and may place a person under arrest if the officer feels that any of the requested identification is not "accurate, complete and true." (Id. at 11-12). In short, plaintiff argues that the ID Rule fails to provide even minimal guidelines for enforcement and vests virtually unlimited discretion in NYPD officers. (Id. at 11-12).

Third, plaintiff argues that the ID Rule reaches a substantial amount of constitutionally protected conduct. Plaintiff compares the ID Rule at issue here with the law in Kolender, claiming that the two laws have "the same 'potential for arbitrarily suppressing First Amendment liberties,' by allowing the police officer to decide who will be punished for violating the [ID Rule] and who will not." (Id. at 13 (citing Kolender v. Lawson, 461 U.S. at 358)). According to plaintiff, the ID Rule also "burdens the constitutional right to freedom of movement" to the same extent as the law in Kolender because it permits officers to demand identification information and documents from people lingering or walking in a public space where they have the right to

25

linger and walk.  (Id. at 14).

While defendant concedes that the ID Rule "may theoretically be enforced either through the criminal court or, as here, via a civil administrative proceeding," defendant TA contends that the overwhelming majority of infractions of TA rules are enforced through civil adjudication. (Def.'s SJ Mem.[20] at 2).  Defendant also disputes plaintiff's claims that the ID Rule vests unlimited enforcement discretion in NYPD officers, arguing that the ID Rule's requirement that the individuals who issue the NOV must be "acting within the scope of their employment and otherwise in accordance with law" limits enforcement discretion.  (Id. at 7).  Defendant claims that enforcement discretion is further limited because TAB Senior Hearing Officers require ID Rule NOVs "to state a lawful basis for the request for I.D. information."  (Id.)  Moreover, defendant claims that the ID Rule is generally only enforced "in conjunction with some other [TA Rule] infraction."  (Id.)  Defendant notes that Mr. Barry was handcuffed and detained "due to his own criminal conduct of being in an unauthorized area," not due to his violation of the ID Rule.  (Id. at 8-9).  Defendant also argues that the ID Rule is distinguishable from the law at issue in Kolender.  According to defendant, Kolender was a First Amendment case, while the instant case is not, because "Kolender was interpreting a statute that had a constitutionally infirm loitering component."  (Id. at 5).

---

[20]Citations to "Def.'s SJ Mem." refer to Defendant Transit Authority's Memorandum of Law in Opposition to Plaintiff Ernest Barry's Motion for Summary Judgment, dated September 10, 2012.

2. Analysis

The ID Rule undisputably defines a criminal offense. The TA promulgates "Rules of Conduct" (the "Rules"), which are set forth in New York's Official Compilation of Codes, Rules, and Regulations. See N.Y. Comp. Codes R. & Regs. Tit. 21, § 1050 *et seq.* Officers of the Transit Bureau of the NYPD are authorized to enforce the Rules, but "[a]ny New York City police officer. . .shall be empowered to issue a notice of violation of any of [the rules of Conduct"]. Id. § 1050.12. Persons committing violations of the Rules, which were designed to promote safety and protect passengers and TA facilities, id. § 1050.1(b), may be prosecuted through summonses returnable to New York Criminal Court or NOVs returnable to hearings before the TAB. Id. § 1050.10; N.Y. Pub. Auth. L. § 1204(5-a). See N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 675 F. Supp. 2d at 414-15.

If convicted of a violation of the ID Rule pursuant to a criminal prosecution in Criminal Court, a person faces potential penalties which include a fine of not more than $25 or a term of imprisonment for not more than 10 days, or both. N.Y. Pub. Auth. L. § 1204(5-a)(a). Individuals processed through the TAB face potential civil penalties of no more than $100 per violation. Id. § 1204(5-a)(b). Defendant's contention that the ID Rule is usually enforced through civil proceedings is unpersuasive and does not save it from an attack based on vagueness. A law with criminal applications "must, even in its civil applications, possess the degree of certainty required for criminal laws." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. at 255 (citing Federal Commc'ns Comm'n v. American Broad. Co., 347 U.S. 284, 296, (1954)). There cannot be one construction for civil enforcement of the ID Rule and another for its criminal enforcement. See Federal Commc'ns Comm'n v. American Broad. Co., 347 U.S. at 296.

27

Defendant's argument that ID Rule NOVs must state a lawful basis for the request for identification is also unavailing.  The Court in <u>Kolender</u> assumed that any stop made pursuant to the law at issue was legally justified and nonetheless held that the law was unconstitutionally vague.  The legality of an initial stop does not immunize the ID Rule from scrutiny under a void-for-vagueness claim.[21]  Similarly, defendant's claim that ID Rule NOVs are generally issued in conjunction with other infractions does little to save the ID Rule from a vagueness challenge.  If in fact ID Rule NOVs are issued only when another TA Rule is violated, this would serve to reduce the frequency with which ID Rule NOVs are issued, but it does not provide notice as to what conduct is prohibited by the ID Rule, nor does it provide guidance to those officers tasked with enforcing the ID Rule so as to prevent arbitrary and discriminatory enforcement.

Next, the Court finds that the ID Rule does not provide "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  <u>United States v. Morrison</u>, 686 F.3d at 103.  The ID Rule provides that "[a]ll persons on or in any facility or conveyance of the authority shall:  provide accurate, complete and true information or documents requested by New York City police officers or authority personnel acting within the scope of their employment and

---

[21]Throughout much of this litigation, plaintiff has claimed that he was standing on the platform, rather than on the steps leading down to the train tracks, when Officer Dutes approached him.  (<u>See</u> Docket # 32).  For the purposes of the instant motions, plaintiff does not expressly concede or dispute this factual issue, but instead contends that it is immaterial to the question of whether the ID Rule is unconstitutional.  (Plaintiff Ernest Steve Barry's Reply Memorandum of Law in Support of Motion for Summary Judgment, filed September 24, 2012 at 3-5).  The Court finds that, even assuming, as in <u>Kolender</u>, that Mr. Barry was initially detained lawfully because he was observed in an "unauthorized area" (Def.'s S.J. Mem. at 8-9), the ID Rule remains unconstitutionally vague in its failure to define what conduct is prohibited.  (<u>See</u> discussion <u>infra</u> at 27-28).

otherwise in accordance with law." 21 N.Y.C.R.R. § 1050.6(d)(3). Although defendant claims

that TAB hearing officers are instructed about how to enforce the ID Rule (Def.'s 56.1 Resp. ¶¶

32-33), there is no dispute that the TA has not promulgated any public guidelines or written

clarification of the ID Rule. (Tr. at 41). Further, whereas the law at issue in Kolender had been

interpreted by the California Court of Appeals, here defendant has not proffered any written

decisions of the TAB, and the Court has not uncovered any relevant case law interpreting or

further defining the parameters of the ID Rule. There is no publically available or authoritative

guidance as to what identification documentation or information may be requested by police

officers pursuant to the ID Rule. Indeed, the ID Rule does not even limit the information or

documents that may be requested by an officer to "identification" information or documents.

Theoretically, the ID Rule as written would authorize an officer to ask someone for his bank

records or demand that a person reveal his or her age or weight. As such, the ID Rule is less

precise than the law found to be unconstitutionally vague in Kolender. Even drawing all

inferences in the light most favorable to defendant, the ID Rule does not provide sufficient notice

as to what conduct is prohibited, because it does not specify with any precision what is meant by

"information or documents" that are "accurate, complete and true."

As an independent basis for finding that the ID Rule is unconstitutionally vague, the

language of the ID Rule encourages arbitrary and discriminatory enforcement. Indeed, as

plaintiff notes, the four officers who witnessed the incident with Barry gave conflicting testimony

as to their understanding of the ID Rule's language. Officer Dutes testified that the ID Rule

authorizes him to demand a verbal statement of name or age and allows him to demand

production of a driver's license, passport, immigration card or other identification. (Dutes Dep.

29

at 71, 73-74). Officer Balkaran stated that he was authorized by the ID Rule to demand "'just regular ID,'" which included a demand for "photo identification." (Balkaran Dep. at 74-75). Officer Joseph Brennan stated that the ID Rule leaves it to the "officer's discretion" as to what identification and documentation can be demanded (Brennan Dep. at 43), and Officer Lyndon Blakely testified that the ID Rule permits him to demand information "'that [the officer] could readily identify as being true' or 'official' identification documents such as a driver's license or passport." (Blakely Dep. at 61).

Further, when asked the meaning of the phrase in the ID Rule "otherwise in accordance with law," Officers Dutes, Balkaran and Brennan all testified that they did not understand what the phrase meant. (Dutes Dep. at 77; Balkaran Dep. at 76; Brennan Dep. at 41). This testimony undermines defendant's contention that the ID Rule's requirement that officers issuing an NOV must act "within the scope of their employment and otherwise in accordance with the law" is not vague and somehow limits enforcement discretion. Even if this language were not vague, the ID Rule's requirement that officers act "within the scope of their employment and otherwise in accordance with the law" does not in any way modify or clarify the type of information or documents that can be requested under the ID Rule.

Based on the language of the ID Rule and the testimony of the NYPD Officers who served as witnesses in this case, the Court finds that the ID Rule suffers from the same lack of explicit standards as the law at issue in Kolender. This lack of standards vests unlimited discretion in the hands of the officers, leaving it up to the individual officer to determine what documents or information they can demand. Indeed, the ID Rule provides no guidance to the officers as to what constitutes "accurate, complete and true" information and documents.

Finally, on the basis of the Supreme Court's holding in <u>Kolender</u>, this Court finds that the ID Rule reaches a substantial amount of constitutionally protected conduct. There is no meaningful distinction between the conduct prohibited by the law at issue in <u>Kolender</u> (failing to provide "credible and reliable" identification) and the conduct prohibited by the ID Rule (failing to provide "accurate, complete and true information or documents"). Defendant's claim that the law at issue in <u>Kolender</u> is distinguishable because it implicated the First Amendment due to a "constitutionally infirm loitering component" is unavailing. (Def.'s SJ Mem. at 5). The Court in <u>Kolender</u> assumed that any stop made pursuant to the law at issue was legally justified, but it held that the statute at issue violated the Due Process Clause of the Fourteen Amendment "by failing to clarify what is contemplated by the requirement that a suspect provide a "credible and reliable" identification. <u>Kolender v. Lawson</u>, 461 U.S. 352. Indeed, the Court's analysis contains hardly any mention of the loitering component of the law at issue. Although plaintiff concedes that plaintiff's Complaint does not specifically allege that the ID Rule violates the First Amendment (Tr. at 30), implicit in plaintiff's argument is the same concern for arbitrary suppression of First Amendment rights that concerned the Supreme Court in <u>Kolender</u>.

In sum, the Court finds that the ID Rule is a criminal law that reaches a substantial amount of constitutionally protected conduct and vests almost unlimited discretion in the NYPD officers charged with enforcement of the ID Rule. Accordingly, the Court finds that the ID Rule is unconstitutionally vague on its face.[22]

---

[22]Plaintiff seeks a declaratory judgment that the ID Rule is unconstitutional to the extent that it requires TA system users to carry identification. Having found that the ID Rule is void-for-vagueness on its face, the Court does not need to reach the question of whether the ID Rule is also unconstitutional on this independent basis.

31

### 3. Availability of a Facial Challenge

Defendant argues that the Court may not entertain a facial challenge to the ID Rule, but instead must assess the law only as applied. (Def.'s SJ Mem. at 5-7). According to defendant, plaintiff's vagueness challenge should fail because plaintiff has not shown that the ID Rule is "impermissibly vague in all of its applications." (Id. at 7 (citing United States v. Rybicki, 354 F.3d 124 (2d Cir. 2003), cert. denied, 543 U.S. 809 (2004))).

The Supreme Court has not developed a clear test as to when courts should entertain facial challenges. "There are few if any general, trans-substantive rules governing facial challenges; the availability of facial challenges varies on a doctrine-by-doctrine basis, in which different underlying constitutional values are protected in different ways by different kinds of substantive tests." Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1327 (2000). As a general rule, vagueness challenges outside of the First Amendment context are viewed as applied. See United States v. Farhane, 634 F.3d 127, 138 (2d Cir.) (citing Chapman v. United States, 500 U.S. 453, 467 (1991)), cert. denied, Sabir v. United States, 132 S. Ct. 833 (2011).

At least some facial vagueness challenges, however, may be brought outside the First Amendment context. See Farrell v. Burke, 449 F.3d 470, n.11 (2d Cir. 2006) (noting that the court in United States v. Rybicki, 354 F.3d 124, assessed the facial validity of the statute at issue even though no First Amendment Rights were implicated). "Among those cases in which consideration of facial challenges outside the First Amendment context is said to be possible, there is disagreement as to the nature of such review." United States v. Rybicki, 354 F.3d at 131 (citing United States v. Salerno, 481 U.S. 739 (1987), and City of Chicago v. Morales, 527 U.S.

32

41) (noting that the Supreme Court had not spoken clearly as to whether a facial challenge

outside the First Amendment context requires a showing that a statute was impermissibly vague

in all applications, or merely that the statute was 'permeated' with vagueness).

     Defendant contends that, under the Second Circuit's holding in United States v. Rybicki,

354 F.3d 124, a facial challenge to a governmental rule or law may not be entertained unless the

rule infringes on a First Amendment right. (Def.'s SJ Mem. at 5).  If a statute or rule does not

implicate First Amendment rights, then it may only be assessed for vagueness "as applied."

United States v. Nadi, 996 F.2d 548, 550 (2d Cir.), cert. denied, 510 U.S. 933 (1993).  Defendant

argues that, here, the alleged constitutional challenge arises from the right to travel, which

defendant contends is not a First Amendment right; "the right to travel. . . seems to arise from

*somewhere* in or around the Constitution (or the common law), but not from the First

Amendment." (Def.'s SJ Mem. at 5 (citing Attorney Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898,

902 (1986)).

     Plaintiff contends that a challenge to the constitutionality of the ID Rule on its face is

appropriate for the same reason that the Supreme Court entertained a facial challenge to the law

at issue in Kolender v. Lawson – that is, the law at issue reaches a "'substantial amount of

constitutionally protected conduct.'" (Pl.'s SJ Mem. at 13 (quoting Kolender v. Lawson, 461

U.S. at 352 n.8 (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. at

494))).

     Since the availability of facial challenges varies on a doctrine-by-doctrine basis, see

Fallon, As-Applied and Facial Challenges, supra, at 1327, the Supreme Court's willingness to

entertain a facial challenge in Kolender is particularly relevant.  The ID Rule requires that people

using the TA system provide "accurate, complete and true information or documents" to NYPD

officers upon request, and the failure to comply may be met with criminal prosecution. (N.Y.

Pub. Auth. L. § 1204(5-a)(a)). The law at issue in Kolender similarly required people to provide

"credible and reliable" identification upon request or face criminal sanctions. Kolender v.

Lawson, 461 U.S. at 353. Although there is no indication that the law at issue in Kolender was

alleged to violate the First Amendment, the Supreme Court indicated that First Amendment

liberties were implicated by the statute at issue. Id. at 358. As discussed above, the Court finds

implicit in plaintiff's argument the same concern for arbitrary suppression of First Amendment

rights that concerned the Supreme Court in Kolender. Accordingly, the Court finds that the ID

Rule reaches constitutionally protected conduct and implicates First Amendment liberties to the

same extent as the law found to be unconstitutionally vague in Kolender v. Lawson, and that,

therefore, the Court may entertain a facial challenge to the ID Rule.[23]

Having found that a facial challenge to the ID Rule is appropriate, the Court need not

_____

[23]Defendant also argues that, to the extent that Rybicki left open the possibility that the
Second Circuit would consider a facial challenge to a statute that did not infringe upon First
Amendment rights, the offending law must not only violate some other constitutional right but
the law must be a criminal law that does not contain a mens rea requirement. (Def.'s SJ Mem. at
6 (citing United States v. Rybicki, 354 F.3d at 131)). Defendant argues that, to the extent that
plaintiff alleges a violation of the right to travel, the alleged infringement must prevent travel "*by
any means;*" thus, an infringement of plaintiff's right to travel on the subway system is not a
constitutional violation because he is free to travel on foot or by bicycle, car, or Greyhound bus.
(Id. at 6 (citing Miller v. Reed, 176 F.3d 1202, 1204-06 (9th Cir. 1999) (stating that
governmental "burdens on a single mode of transportation do not implicate the right to interstate
travel"))). Defendant contends that the same analysis should apply to an alleged infringement of
the right to travel intra-state. (Id. at 6 (citing Selvan v. N.Y. Thruway Auth., 584 F.3d 82, 100
(2d Cir. 2009)). Thus, even if Barry is prevented from traveling on the subway system, defendant
argues that there are other modes of transportation available and no facial challenge to the ID
Rule should be considered. (Id. at 7). Having found that a facial challenge to the ID Rule is
appropriate because the ID Rule implicates First Amendment Rights to the same extent as the
law at issue in Kolender, the Court does not address this prong of defendant's argument.

34

address defendant's contention that the particular application of the ID Rule to plaintiff's case

was valid. However, the Court notes that the ID Rule is unconstitutionally vague as applied to

the specific facts of this case. First, the ID Rule did not provide Mr. Barry with fair notice of

what conduct was prohibited. It is undisputed that Mr. Barry verbally identified himself,

although defendant claims that Mr. Barry did so "only after Officer Dutes requested

identification three times." (Pl.'s 56.1 Stmnt ¶ 12; Def.'s 56.1 Resp. ¶ 12). Officer Dutes

testified in this case that he asked for further identification from Mr. Barry because he felt that

"giving. . .his name was not good enough at the time, the way he was acting." (Pl.'s 56.1 Stmnt ¶

17; Def.'s 56.1 Resp. ¶ 17). The ID Rule did not provide Mr. Barry with fair notice about

whether identification beyond a verbal statement of his name could be demanded. Nor could he

know whether supplemental verbal responses could have satisfied the ID Rule. Additionally, the

ID Rule did not provide Officer Dutes with sufficient guidelines for enforcing the ID Rule

against Mr. Barry. While Officer Dutes found that Mr. Barry's verbal identification was "not

good enough at the time," other officers could have reasonably found that a verbal statement was

sufficient to satisfy the ID Rule's requirement that the identification be "accurate, complete and

true." In short, the Court finds that the ID Rule is unconstitutionally vague, both facially and as

applied.

CONCLUSION

For the reasons stated herein, the Court holds that the ID Rule is unconstitutionally vague on its face and as applied. Accordingly, defendant's motion to dismiss is denied, summary judgment is granted in favor of plaintiff Barry, and the Court issues a Declaration that the ID Rule, as currently written, is unconstitutional.

**SO ORDERED.**
Dated: Brooklyn, New York
   March 21, 2013

         /s/ Cheryl L. Pollak
         Cheryl L. Pollak
         United States Magistrate Judge
         Eastern District of New York